John MUSMECI, et al.

v.

SCHWEGMANN GIANT SUPER MARKETS, et al.

Civ.A. No. 97–2757.

United States District Court, E.D. Louisiana.

Aug. 23, 2001.

Nancy Picard, Edward K. Newman, Robein, Urann & Lurye, Metairie, LA, for plaintiffs.

John A. Gegenheimer, Jon A. Gegenheimer, Attorney at Law, Gretna, LA, for Swegmann Giant Supermarkets, Inc., John F. Schwegmann, and John Schwebmann, Jr. Trust Estate.

Howard Bruce Kaplan, Bernard, Cassisa, Elliott & Davis, Metairie, LA, for U.S. Fidelity & Guaranty Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARBIER, Distirct Judge.

Plaintiffs are former employees of Schwegmann Giant Super Markets ("SGSM") who have filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, or alternatively, under state law, seeking to have their pension benefits in the form of retirement grocery vouchers and/or monetary payments reinstated, and for equitable relief requiring Schwegmann, the plan sponsor, to fulfill accrual, vesting, and funding requirements under ERISA. Schwegmann terminated the voucher program in February 1997, when it sold its chain of grocery stores. Plaintiff, John Musmeci, and other plaintiffs, on behalf of themselves and others similarly situated, claim that they are vested in their retirement benefits by effect of law and under the terms of the benefit plan and are

entitled to receive the vouchers or their equivalent for life.

Plaintiffs filed this suit in September 1997. In July 2000, this Court certified the matter as a class action. The plaintiff class is defined as

> Those individuals who were SGSM employees and (1) who were retired and receiving the grocery vouchers when SGSM stopped the program, or (2) who, although not retired or receiving the grocery vouchers at the time SGSM stopped the grocery program, were (i) supervisors for at least one year before retirement, and (ii) had at least 20 years experience with SGSM.

Rec. Doc. 156.

Defendant SGSM is the partnership that employed plaintiffs and is alleged to have sponsored the retirement grocery voucher plan.[1] SGSM, Inc., G.G. Schwegmann Company, and the John Schwegmann, Jr. Trust Estate are the constituent partners. Defendant SGSM Pension Plan is alleged to be the retirement grocery voucher plan, although Schwegmann never identified it as such. Plaintiffs allege that John F. Schwegmann, who was chief executive officer of SGSM, Inc., is a fiduciary of the voucher plan, and is therefore personally liable for various violations of the duties concomitant to that status. Defendant United States Fidelity & Guaranty Company ("USF&G") is the insurer of the Schwegmann entities.

This matter came on for trial before the Court, sitting without a jury, on July 30 and 31, 2001. At the close of the evidence and following closing arguments, the Court took the matter under advisement.[2] Having considered the pleadings, evidence at trial, arguments of counsel, and applicable law, the Court now renders its Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### *Making groceries Schwegmann's style* [3]

A popular television commercial jingle once boasted of "Makin' groceries, Schwegmann's style." The jingle required no explanation for the generations of New Orleanians who grew up shopping for groceries (and other sundry items) at Schwegmann Giant Supermarkets, until recently a dominant player in the local retail grocery business. So well-known and so popular

---

1. On September 20, 2000, SGSM partnership filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. That petition was filed in the United States Bankruptcy Court, Eastern District of Louisiana (Case no. 00–15876, Sec. B). The automatic stay was ultimately lifted to allow plaintiffs to liquidate their claims against the partnership.

2. Only the ERISA claims were taken under advisement. At the close of plaintiffs' case-in-chief, the Court granted defendants' motion for judgment as a matter of law pursuant to Rule 52(c) (Judgment on Partial Findings) on all of plaintiffs' state law claims.

3. Much of the history of Schwegmann's in New Orleans can be gleaned from local media reports chronicling the demise of the local grocery empire: Keith Darce, *Schwegmann May Finally Ring Up Sale*, NEW ORLEANS CITY-BUSINESS, Feb. 10, 1997 at 1; Elliott Zwiebach, *Schwegmann is Acquired by Kohlberg; CEO Retires*, SUPERMARKET NEWS, Feb. 24, 1997 at 1; Ronette King, *A Bitter Cup of Tea to Swallow—Stores' Takeover Stumbled at Outset*, NEW ORLEANS TIMES-PICAYUNE, Mar. 2, 1997 at F1; Ronette King, *It Would Have Been Insane for Me to Stay and Bleed to Death*, NEW ORLEANS TIMES-PICAYUNE, Mar. 2, 1997 at F1; Ronette King, *Food Fight: Schwegmann's Exit from the Grocery Scene*, NEW ORLEANS TIMES-PICAYUNE, Oct. 3, 1999, at F1; David Merrefield, *Schwegmann*, SUPERMARKET NEWS, Apr. 19, 1999; *Checking Out: The Last of Schwegmann's*, NEW ORLEANS MAGAZINE, Sept. 1, 1999, at 13.

was Schwegmann's at one time, that other businesses would advertise their locations by proclaiming "And Schwegmann's is still next door".[4] Still later, when Schwegmann's market dominance was being challenged by large, national chain grocery stores, one of its chief competitors advertised that its prices were "Cheaper than Schwegmann's". Schwegmann's was not simply *in* New Orleans --- for most of its customers, Schwegmann's *was* New Orleans.

The first Schwegmann grocery store in New Orleans was founded as a "mom and pop" business in 1869. In 1946, John G. Schwegmann, the grandson of the original founders, joined the family business along with two of his brothers. Together they opened the first Schwegmann Bros. Giant Supermarket on St. Claude Avenue. John G. Schwegmann was considered a genius by many in the retail grocery business. He turned grocery stores into large, self-service operations, instead of having store clerks retrieve items for each customer.[5] He conceived and pioneered the "superstore" concept so popular today.... providing his customers with one-stop shopping by including service stations, banking, shoe stores, jewelry departments, pharmacies,

and selling sundry items such as lawnmowers, air-conditioners, bicycles, etc.

Over the next approximately one-half of a century, SGSM partnership ("the partnership" or "Schwegmann") operated a chain of grocery stores which eventually grew to more than 40 stores employing over 5000 employees, mostly in the New Orleans area. The Schwegmann partnership was comprised of SGSM, Inc., G.G. Schwegmann Company, and the Trust of John Schwegmann, Jr. in favor of John Francis Schwegmann and Guy George Schwegmann. SGSM, Inc. had a 70 percent interest in the partnership and was its managing partner. The Schwegmann partnership employed all employees in the Schwegmann grocery stores at all times pertinent to this litigation. For many years and until its sale in 1997, the Schwegmann chain of grocery stores continued to be a dominant player in the local retail food market.[6]

Until 1979, SGSM, Inc.'s majority shareholder was John G. Schwegmann, the grocery chain's founder, and father of John F. Schwegmann, a defendant herein. In 1979, John F. Schwegmann ("Mr.Schwegmann") purchased his father's stock in SGSM, Inc., becoming its majority stockholder and chief executive officer. As

---

4. This jingle was popularized by a now-defunct car dealer, Jacobsen and Young, whose Westbank location was next door to one of the Schwegmann grocery stores.

5. John G. Schwegmann founded not only a business empire, but began somewhat of a political dynasty as well. He was elected first as a state senator and later as a member of the state public service commission. His son, John F. Schwegmann, would later take his place not only as head of the supermarket chain, but also as a member of the public service commission. John F.'s wife, Melinda, served as Lieutenant Governor of the Louisiana, and currently serves as a state house member from New Orleans. For many years, Schwegmann blended groceries with politics

by featuring the portraits of favored political candidates on Schwegmann's grocery bags.

6. The local chain held a 33 percent market share in the early 1980's, but gradually lost ground to the competition. By 1995, Schwegmann's held a 25 percent market share, which increased to 39 percent following acquisition of the former National Tea Company chain. By the time Schwegmann sold its stores to a group of investors in February, 1997, its market share had fallen to 31 percent. Ronette King, *It Would Have Been Insane for Me to Stay and Bleed to Death*, NEW ORLEANS TIMES-PICAYUNE, Mar. 2, 1997 at F1; Keith Darce, *Remakin' Groceries*, NEW ORLEANS CITYBUSINESS, Feb. 24, 1997, at 1.

chief executive of SGSM, Inc.,[7] Mr. Schwegmann was ultimately responsible for the daily operations of the Schwegmann partnership and was involved in making overall company policy-related decisions for the grocery chain. At all times pertinent, Mr. Sam Levy, who is not a party to this suit, served as president of SGSM, Inc. and as director of operations for the Schwegmann partnership. Mr. Schwegmann and Mr. Levy were also members of SGSM, Inc.'s board of directors.

### The Voucher Program

In 1984 or 1985, Mr. Schwegmann conceived the arrangement referred to in this litigation as the retirement grocery voucher program. In 1985, Messrs. Schwegmann and Levy, along with Joe Warnke, the partnership's director of human resources, discussed creating a grocery voucher program that might be given to loyal long-term employees at their retirement. The program was designed to assist retirees in meeting their monthly food needs by providing them with vouchers that could be used in lieu of cash to purchase goods in the Schwegmann stores. One factor that motivated Mr. Schwegmann to establish the program was his desire to help ensure that certain long term and loyal employees would always "have food on their tables." Messrs. Schwegmann, Levy, and Warnke discussed possible guidelines for the program as well as qualifications for participation. On July 2, 1985, Mr. Warnke sent a memorandum to Mr. Schwegmann captioned "Retirement/Compensation Policy." (Exhibit 3). In that memorandum, Mr. Warnke memorialized the criteria, as discussed at the Schwegmann–Levy–Warnke meeting, an employee would have to meet in order to qualify for the grocery voucher program. In particular, the employee:

* Must have completed twenty (20) years of service.
* Must have achieved the age of sixty (60).
* Must have been employed in the position of supervisor or a position of greater responsibility for at least one year at the time of retirement.

*Id.*

The memo also memorialized Mr. Schwegmann's desire to compensate some managers monetarily in addition to or in lieu of grocery vouchers, and made reference to certain managers who were already retired and receiving monetary compensation. One individual receiving monetary compensation as of July 2, 1985, was Mr. Joseph T. Spitelera, a non-class plaintiff. Mr. Spitelera began receiving $305 dollars per month when he retired from the Schwegmann partnership in 1980. Mr. Spitelera worked for the partnership for over 25 years. During part of that time, he served as an assistant store manager and supervised about eight other employees. Spitelera deposition at 9. Mr. Spitelera never received food vouchers.

Aside from Mr. Warnke's July 2, 1995, memorandum, the voucher program was never formally reduced to writing. And while other benefits such as 401(k) ERISA benefits, certain insurance and hospitalization benefits, and other specified benefits were itemized in a "draft" employee handbook, the grocery voucher program was never included in the book.[8] Nevertheless,

---

**7.** At all times pertinent, Mr. Schwegmann also served as president of G.G. Schwegmann Company and as co-trustee of the John Schwegmann, Jr. Trust Estate. For a time, he also served as vice-president of SGSM, Inc.

**8.** The draft handbook was never finalized and therefore was not distributed to the Schweg-

the voucher program was common knowledge among the partnership employees who learned of the program from supervisors, other employees, and by seeing the vouchers used in the Schwegmann stores.[9] Employees also learned of the program at retiree luncheons and annual banquets held to honor employees who had attained 20 years of service or more. At those functions, in the presence of family and coworkers, retirees were often personally notified of the Schwegmann grocery voucher program.

Each grocery voucher had a face value of $54 dollars and qualified retirees received a total of $216 dollars worth of vouchers each month. Exhibit 1. Messrs. Schwegmann and Levy found this amount to be adequate to satisfy the basic nutritional needs of the employee and his or her spouse. A notation was printed on each voucher indicating that it was valid for a period of thirty days.

Although the vouchers were intended to be used only for groceries with no cash redemption, store personnel, including some managers responsible for enforcing this policy, were for the most part unaware of the proscription, given that there were no written procedures regarding the vouchers. Accordingly, retirees were often given change in cash while using the vouchers toward grocery purchases. And while the vouchers were intended to be

restricted to use only by the retiree and his or her spouse, it is unclear from the record how the Schwegmann partnership enforced that restriction in light of the complete lack of training or instruction given to store employees who accepted the vouchers. Even after one retiree was scolded for redeeming one of his vouchers for cash, the cashier involved was never reprimanded nor was any bulletin or writing issued to the cashiers or managers. And following a short hiatus, the employee continued to receive vouchers. With no official guidance, handling of vouchers was pretty much left up to the individual store managers.

The Schwegmann grocery voucher program had systematic and detailed procedures in place for disbursement of the vouchers. Leroy "Lee" Janies, the partnership's director of human resources from 1984 to 1997, performed the ministerial aspects of the voucher program. When a manager or supervisor informed him that an employee was retiring, Mr. Janies would direct his secretary to fill out a form with information from the 20-year data he kept on a computer in his office. The information included the retiring employee's years of service, the dates of service that he had been a supervisor or equivalent, and his age.[10] See Exhibit 4, at 34–50. Mr. Janies verified that the employee met the program's criteria before forward-

---

mann employees. Rather, the draft was distributed to the Schwegmann payroll clerks for their use in the course of their job duties.

9. In the Schwegmann organization, all benefit information was conveyed informally and often orally. If an employee had a benefits question, he first went to his supervisor who either answered the question or contacted the next level of manager for an answer. If that manager could not answer the question, then he went to his supervisor, and so on, until someone ultimately contacted the personnel department for help.

10. It was not necessary to be a full supervisor in order to meet the "supervisor" status criterion. Assistant supervisor positions qualified and some positions such as pharmacist and buyer were considered equivalent to "supervisor." Some persons considered supervisors actually supervised no other employees. Further, even if an employee was a supervisor but later changed to a lower position, he was qualified to receive vouchers.

ing the form to Sam Levy. Mr. Levy, who Mr. Schwegmann often empowered to make the final decision as to whether an employee qualified to receive grocery vouchers,[11] would sign the form and send it to the Schwegmann partnership controller, Mr. Gene Lemoine. Mr. Janies kept a list of all retirees receiving retirement grocery vouchers and reviewed it periodically to remove those persons who were deceased. No retiree was removed from the list once he began receiving vouchers other than for death.

Mr. Lemoine also kept a list of all retirees receiving vouchers, and the personnel office would notify him when someone was to be added or deleted. Mr. Lemoine had custody of the printed vouchers and kept them at all times under lock and key. Each month his secretary would type-up the vouchers and forward them to Mr. Lemoine. Mr. Lemoine would then count the vouchers, sign them, and remove the copy to be kept for office records in order to match it with the original voucher which was redeemed at the store. The vouchers were then mailed out two to three days before the end of the month. The redeemed vouchers were returned to Mr. Lemoine. Ninety-nine percent of all vouchers issued were redeemed. The Schwegmann partnership retained the vouchers for five years until that practice became too burdensome.

The Schwegmann partnership did not set up a separate trust fund to finance the grocery voucher program. Rather, the voucher program was funded out of the partnership's general revenues. The partnership's tax returns for the tax year ending June 25, 1996, reveal that the partnership deducted as a business expense the total face value of the food vouchers issued that year under the category "[r]etirement plans, etc." Exhibit 20 (under seal). Furthermore, each year, the partnership issued Internal Revenue Service form 1099–R, which is used specifically for reporting pension and retirement benefits, to employees receiving vouchers. Exhibit 10. The taxable amount shown on each form 1099–R was the face value of the vouchers that the employee had received for the year.

During the life of the program, all Schwegmann partnership employees who met the criteria listed in the Warnke memorandum, received grocery vouchers at retirement. However, Mr. Joseph DeCuir did not receive food vouchers for eighteen months following his retirement in January 1995. Mr. DeCuir retired at age 62 after having served as head pharmacist for several years. After contacting Mr. Janies, he was told that he did in fact qualify for the program but had "fallen through the cracks." He began receiving the vouchers from that point forward, nonretroactively. Also, Ms. Yvonne White was denied vouchers at first due to allegations of "questionable" conduct. However, Ms. White appealed the denial and eventually began receiving vouchers.

Ms. Margaret Dominick was denied vouchers despite meeting the voucher years, service, and position criteria. Her employment with the partnership was involuntarily terminated due to misconduct.[12] She was close to eighty years old at the time. Ms. Dominick was the only employee identified as having met the criteria but denied vouchers.

11. When the program first began, Mr. Schwegmann was involved in each decision regarding final approval of a retiree for vouchers. As time went on, the system eventually became more perfunctory with Mr. Schwegmann delegating approval authority to Mr. Levy.

12. Ms. Dominick was accused of stealing candy.

Schwegmann employees who met the other retirement grocery voucher plan criteria could receive vouchers when they retired before age 60 if they became disabled. One example of this is Lee Edward Weary who retired from the position of assistant day grocery supervisor after 24 years of service at age 54. After exceeding his allowable medical leave he began receiving vouchers. *See* Exhibit 14, at 700; Exhibit 8, at 99.

### Cheaper than Schwegmann's

By the early 1990's, Schwegmann's was under fire from several large, well-financed national supermarket chains. Ironically, these national chains used the superstore concept first popularized by John G. Schwegmann in New Orleans. With their significant financial resources, the national chains starting building newer, better located supermarkets in the New Orleans metropolitan area. The national chains were also able to put added downward pressure on Schwegmann's already low grocery prices. In 1995, John F. Schwegmann decided the only way to survive was to expand aggressively. Schwegmann's took on substantial debt to finance its acquisition in 1995 of the 28–store former National Tea Company chain. Ultimately the acquisition proved to be the beginning of the end of the Schwegmann grocery empire. In light of significant continuing financial losses, the Schwegmann partnership's grocery business was eventually sold to SGSM Acquisition Company, L.L.C., a subsidiary of Kohlberg

Company, on February 14, 1997.[13] Mr. Schwegmann signed a letter dated February 7, 1997, which was mailed to the voucher and cash payment recipients. Exhibit No. 2. The letter advised them that they would no longer receive vouchers or cash due to the sale of the grocery business. Because Schwegmann considered the voucher program and payments as gratuities subject to termination at will, continuation of the voucher program was never factored into the negotiations with Kohlberg. Nor did the partnership or Mr. Schwegmann seek advice of counsel before terminating the program.

As of February 1997, between 36 and 40 former Schwegmann partnership employees were actually receiving grocery vouchers. Another 19 (approximately) were (1) 60 or over, (2) had 20 years of service, and (3) had one year in a supervisory capacity but had not yet retired. Another 73 (approximately) had (1) 20 years of service, and (2) one year of supervisory capacity but had not yet reached age 60 or retired. Another group, both over and under age 60, had 20 years of service but it is uncertain whether members of that group had served in a supervisory capacity.[14] Since February 1997, no partnership retirees have received grocery vouchers or monthly cash payments. Prior to that time, Schwegmann retirees who qualified for grocery vouchers or cash continued to receive those benefits until death. All employees understood that the grocery

---

**13.** Two years later, in 1999, SGSM Acquisition itself filed for bankruptcy protection, marking the final chapter for the Schwegmann name in the local grocery business. The former Schwegmann stores were closed and many of the locations were sold to other supermarket companies. Ronette King, *Food Fight: Schwegmann's Exit from the Grocery Scene*, NEW ORLEANS TIMES-PICAYUNE, Oct. 3, 1999, at F1; David Merrefield, *Schwegmann*, SUPERMARKET NEWS, Apr. 19, 1999.

**14.** Although the Court is referring to "groups" of plaintiffs, only one class of plaintiffs was certified. With regard to the latter group where supervisor status is uncertain, the Court advised the parties before trial that this issue would be dealt with after trial and following a ruling as to liability.

voucher benefit was not transferable to the non-employee spouse upon the retiree's death.

Plaintiffs, with the exception of Mr. Spitelera, seek resumption of their grocery vouchers or the monetary equivalent in the amount of $216 dollars per month for life, back payments dated from March 1, 1997 (or in the case of class members who "fell through the cracks," back payments from the date each should have received benefits). Mr. Spitelera seeks back payments and future payment in the amount of $305 dollars per month. All plaintiffs seek prejudgment interest on the back due payments dating from March 1, 1997, the date the plan was terminated, plus costs, including attorney's fees.

### CONCLUSIONS OF LAW

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 because plaintiffs claim violations of ERISA, 29 U.S.C. § 1001, *et seq.* *See* 29 U.S.C. § 1132(f); *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.,* to provide federal standards for the establishment and maintenance of employee pension and benefit plans. *Williams v. Wright,* 927 F.2d 1540, 1543 (11th Cir. 1991). One of Congress's central purposes in enacting ERISA was to prevent the "great personal tragedy" suffered by employees whose vested retirement benefits are not paid when pension plans are terminated. *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 374–75,

100 S.Ct. 1723, 1732–33, 64 L.Ed.2d 354 (1980) (quoting 3 Leg. Hist. 4793, Senator Bentsen). In short, Congress wanted to insure that when an employer promised an employee a pension benefit upon retirement, and the employee fulfilled whatever conditions were required to obtain the benefit, that he actually received it. *Id.* Consequently, ERISA was designed to be remedial legislation meriting a liberal construction in favor of protecting participants' interests in employee benefit plans. *Smith v. CMTA–IAM Pens. Trust,* 746 F.2d 587, 589 (9th Cir.1984).

An employer is under no legal obligation to create an employee pension plan—the decision to create one is entirely voluntary—but once a plan is established, ERISA entitles an employee to any vested benefits that arise under the plan. *See Moeller v. Bertrang,* 801 F.Supp. 291, 293 (D.S.D.1992) (citing *Williams,* 927 F.2d at 1543). An employer's promise to pay pension benefits is enforceable under ERISA when the plan pursuant to which the benefits are paid falls within the scope of ERISA's coverage provisions. *See Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1503 (9th Cir.1985). Pursuant to those coverage provisions, ERISA applies to any employee benefit plan if it is established or maintained by an employer engaged in commerce or activity affecting commerce. *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 240 (5th Cir.1990) (citing 29 U.S.C. § 1003(a)). Accordingly, ERISA does not regulate all benefits paid by the employer to an employee but rather only those benefits paid pursuant to an *employee benefit plan.* *See Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 7, 107 S.Ct. 2211, 2215, 96 L.Ed.2d 1 (1987).

ERISA regulates two distinct types of employee benefit plans: "employee welfare benefit plans" (welfare plans)

and "employee pension benefit plans" (pension plans). *Memorial Hosp. Sys.,* 904 F.2d at 240; *see* 29 U.S.C. § 1002(3).[15] Classification of an employer's plan as a welfare plan versus a pension plan has significant ramifications because welfare plans are exempted from the participation, vesting, and funding requirements that ERISA imposes upon pension plans. *Handbook on ERISA Litigation* § 1.01[B] (2d Ed.2000 Supp.) (citing 29 U.S.C. §§ 1051, 1081, 1103(b); 29 C.F.R. § 2510.3–2(a)); *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995). Furthermore because *pension* benefit plans are subject to minimum vesting standards, they are generally non-terminable, unlike *welfare* benefits, which the employer is generally free to modify or terminate at any time for any reason. *Curtiss–Wright,* 514 U.S. at 78, 115 S.Ct. at 1228; *Musto v. American General Corp.,* 861 F.2d 897, 901 n. 2 (6th Cir.1988) (citing *In re White Farm Equip. Co.,* 788 F.2d 1186 (6th Cir. 1986)).

## I. Is the Schwegmann Grocery Voucher Program an ERISA Benefit Plan?

### 1. Is the Schwegmann grocery voucher program an ERISA welfare benefit plan subject to termination?

■ ERISA defines welfare benefits to include several enumerated benefits, including medical disability, unemployment benefits, vacation benefits, and any benefit described in section 186(c). *Scott,* 754 F.2d at 1502 (citing 29 U.S.C. § 1002(1)(B)). Courts have repeatedly held that severance benefit plans qualify as ERISA welfare benefit plans pursuant to the reference to section 186(c) noted above. *Id.* (citing *e.g., Blau v. Del Monte Corp.,* 748 F.2d 1348 (9th Cir.1984)); *Whitfield v. Torch Operating Co.,* 935 F.Supp. 822 (E.D.La.1996) (Fallon, J.) (citing *e.g., Morash,* 490 U.S. at 114 & n. 8, 109 S.Ct. at 1672).

Of the welfare benefits covered by ERISA, the only one that the Schwegmann voucher program could even arguably fall under would be that of a severance benefit program given that receipt of the vouchers was contingent upon termination of employment. However, the grocery vouchers weren't merely given at the termination of employment but rather at the termination of employment due to *retirement* at a specified age. Benefits triggered by attainment of a specific age, conditioned upon length of service, and paid until death are hallmarks of a pension benefit plan, not a welfare benefit plan. *See Modzelewski v. Resolution Trust Corp.,* 14 F.3d 1374, 1376 (9th Cir.1994).

Furthermore, Department of Labor regulation 29 C.F.R. § 2510.3–2(b) militates

---

**15.** ERISA recognizes two basic types of pension plans: defined benefit plans and defined contribution plans. A *defined contribution plan* is one where employees and employers may contribute to the plan, the employer's contribution to the plan is fixed, and the benefit received at retirement is whatever level of benefits the amount contributed on the employee's behalf provides. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439, 119 S.Ct. 755, 761, 142 L.Ed.2d 881 (1999) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980)). A *defined benefit plan* consists of a general pool of assets rather than individual dedicated accounts. *Id.* Under such a plan, the employee is entitled to a fixed periodic payment upon retirement. *Id.* (quoting *Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993); *Mead Corp. v. Tilley,* 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989); 29 U.S.C. § 1054(c)); *see* 29 U.S.C. § 1002(35). It is undisputed that Schwegmann employees did not make contributions to the grocery voucher program. Therefore, if the Schwegmann grocery voucher program is an ERISA pension plan, it could only potentially fit into the defined benefit plan classification.

against finding that the Schwegmann voucher program was a welfare benefit plan. Pursuant to that regulation a severance benefit arrangement will not be deemed to constitute a pension plan solely by reason of the payment of severance benefits on account of termination of employment if (1) the payments are not contingent upon the employee's retiring, (2) the total amount of the payments don't exceed the equivalent of twice the employee's annual compensation during the year immediately preceding termination of employment, and (3) the payments are completed within 24 months of termination of employment. *Id.* § 2510.3–2(B)(1)(I)–(iii)(B). In the instant case, the Schwegmann voucher program clearly does not meet requirements (1) and (3) because receipt of the vouchers was conditioned upon retirement and the retiree received the vouchers until death. Accordingly, the Schwegmann voucher program is not an ERISA welfare benefit plan.

### 2. Is the Schwegmann Grocery Voucher Program an ERISA Pension Plan?

■ ERISA defines an "employee pension benefit plan" as

[A]ny plan, fund, or program ... **established or maintained** by an employer ... to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program ... provides **retirement income** to employees ...

29 U.S.C.A. § 1002(2)(A)(I) (West 1999) (emphasis added).

Although the ERISA statutory scheme is detailed and complex, the statute does not define key terms such as "plan" and "established." Therefore, when deciding whether a given benefit falls under ERISA, courts should always keep in mind the goals and policies furthered by ERISA and the types of hardships that Congress sought to avoid by enacting the statute. *See Preuc,* 1997 WL 538933, at *3 (D. Guam Aug. 29, 1997) (citing *Morash,* 490 U.S. at 107, 109 S.Ct. at 1668). As the Ninth Circuit has noted, Congress defined the term "pension plan" so broadly that virtually any contract that provides for some type of deferred compensation will also establish a de facto pension plan. *Modzelewski,* 14 F.3d at 1377. The parties' intent to the contrary is irrelevant. *See id.*

### a. Do the grocery vouchers constitute retirement income?

According to section 1002(2)(A), an ERISA pension plan is one that provides retirement "income." 29 U.S.C. § 1002(2)(A)(I).[16] Mr. Spitelera, who received $305 dollars per month after he retired from Schwegmann, unarguably satisfies this requirement. The issue to be resolved with respect to the plaintiff class is whether the Schwegmann grocery vouchers constitute retirement income for purposes of ERISA.

Neither the ERISA statutory scheme nor the federal regulations define the term "income." The statute is equally silent on the permissibility of any type of in-kind benefit or other non-cash payment. Nevertheless, of the very few reported decisions on the issue, courts have tended to exclude from ERISA coverage plans that pay a non-cash benefit.[17] *See, e.g., Preuc*

---

**16.** The alternative requirement, that the plan result in deferral of income, *see* 29 U.S.C. § 1002(2)(A)(ii), is not implicated by the facts of this case.

**17.** The *Preuc* case is distinguishable from this case on its facts. See note 11 *infra* for that discussion. *Jervis* is likewise unpersuasive. *Jervis* involved a landlord's breach of an agreement to provide his long term apartment

*v. Continental Micronesia, Inc.*, 1997 WL 538933 (D.Guam Aug.29, 1997); *Jervis v. Elerding*, 504 F.Supp. 606 (C.D.Cal.1980).

The Court notes, however, that the statute does not expressly require a benefit paid in cash. Indeed, if Congress had sought to limit ERISA's coverage to cash pension payments, it could very well have expressed that intent by using a term far more specific and descriptive than "income." Instead, when choosing a term that would be one of many to set the outer limits on ERISA's applicability, Congress chose the very term that it had employed when attempting to stretch the reach of the Internal Revenue Code to its broadest limits—a term that for years had gained notoriety for its almost limitless applicability to various types of compensation, including non-cash payments. *See United States v. Parr*, 509 F.2d 1381, 1385 (5th Cir.1975) (citing *Commissioner v. Smith*, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830 (1945)); 26 U.S.C. § 61 (gross income defined).

Given that ERISA provides no definition of income of its own, and that Congress chose a term inextricably linked to the tax code, the Court finds guidance in that term as used in the Internal Revenue Code, 26 U.S.C. § 1, *et seq.* For purposes of the tax code the term "gross income" is to be broadly interpreted and income need not be in the form of currency so long as it can be valued in terms of currency. *Parr*, 509 F.2d at 1385 (citing *Commissioner v. Smith*, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830 (1945)). Neither party disputes that

the grocery vouchers would be considered income under the broad reach of the tax code. However, defendants argue that tax code provisions and interpretations are irrelevant for purposes of interpreting ERISA's terms.

To the contrary, other courts, including the Supreme Court, have recognized the interrelatednesss of ERISA and the tax code and the advantages of maintaining consistency between like provisions of ERISA and the tax code. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442–43 n. 4, 119 S.Ct. 755, 762–63, 142 L.Ed.2d 881 (1999) (bolstering the conclusions of the Court by pointing out their consistency with treasury regulations promulgated for income tax purposes); *Modzelewski*, 14 F.3d at 1378 (looking to IRS regulations for guidance on vesting). Furthermore, ERISA expressly provides that any regulations promulgated under section 1301(b)(1) must be consistent with regulations prescribed for similar purposes under the Internal Revenue Code. 29 U.S.C. § 1301(b)(1). Accordingly, courts readily rely upon tax code jurisprudence when interpreting the term "trade or business" as used in ERISA. *See, e.g., Connors v. Incoal, Inc.*, 995 F.2d 245, 250 (D.C.Cir. 1993); *Central States, Southeast & Southwest Pens. Fund v. Personnel, Inc.*, 974 F.2d 789, 794 (7th Cir.1992).

It is also worth noting that under the tax code, the Schwegmann grocery vouchers would not be excludable from income as gifts to the former employees. *See* 26 U.S.C. § 102 (gifts excluded from gross

manager with a free apartment and paid utilities upon retirement. The district court dismissed plaintiff's suit and broadly held that an employment contract promising in-kind retirement compensation is not a benefit plan under ERISA. In reaching that conclusion the court relied upon two Department of Labor opinion letters (79–79 & 76–110). Those opinion letters, however, do not support such

a broad holding but rather opine that the specific benefits at issue in those cases were not ERISA plans but rather employment contracts. In fact, the Eleventh Circuit expressly disavowed both of those opinion letters for the broad interpretation relied upon by the *Jervis* court. *See Williams*, 927 F.2d at 1547 n. 15.

income). Although an employer can make a gift to an employee without rendering it taxable whether made before, during, or after the termination of service, there is a strong presumption that such a payment is compensation for services. *Willkie v. Commissioner of Internal Revenue*, 127 F.2d 953, 955 (6th Cir.1942) (citing *Bass v. Hawley*, 62 F.2d 721 (5th Cir.1933)). The intention of the parties, particularly that of the payor, as gleaned from the facts and circumstances surrounding the transaction, are of primary importance in determining whether the payment is a gift or compensation. *Id.* (citing *Fisher v. Commissioner of Internal Revenue*, 59 F.2d 192 (2d Cir. 1932)). Further, a payment made voluntarily and without legal obligation may nevertheless be compensation for services. *Id.* (citing *Old Colony Trust v. Commissioner of Internal Revenue*, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929)).

Assuming *arguendo* that the value and periodicity of the vouchers would even permit them to be classified as gifts under the internal revenue code, the objective facts and circumstances belie the assertion that they were intended as gifts. Most telling is the way Schwegmann treated the vouchers for tax purposes—deducting them as a business expense rather than classifying them as business gifts, and reporting them on form 1099–R. Also, on December 15, 1988, Mr. Janies wrote a letter to the Social Security Administration on behalf of Mr. Jack Pereira and described the vouchers "retirement type income." Exhibit 5. Even the 1985 Warnke memo discussing

the program was captioned "Retirement/*Compensation* Policy." (emphasis added). These undisputed facts not only preclude gift classification for tax purposes but also show that the Schwegmann organization at all times treated the vouchers like income paid to the retiree.

Based on the foregoing, the Court concludes that the term "income" as used in the definition of a pension benefit plan is sufficiently broad to encompass the Schwegmann grocery vouchers. Given that Congress chose a term known to include forms of compensation other than cash, it is not for this Court to narrow ERISA's coverage by doing what Congress chose not to: limiting coverage to cash pension benefits. Such an interpretation would be contrary to the liberal construction due ERISA.

The Court notes that federal regulation 29 C.F.R. § 2510.3–1(e) states that the sale by an employer to its employees, whether or not at prevailing market prices, of articles or commodities of the kind which the employer offers for sale in the regular course of business does *not* constitute an employee pension benefit plan. To the Court's knowledge only two cases have interpreted or applied this regulation.[18] Nor was the Court able to locate any Department of Labor opinion letters discussing this particular regulation in a manner helpful to the case at hand. Consequently, the Court is left with little guidance on the applicability of the regulation to the Schwegmann voucher program.

---

**18.** One of those cases was the *Preuc v. Continental Micronesia* case cited above. In *Preuc*, the district court relied on 29 C.F.R. § 2540.3–1(e) to conclude that in-kind "no additional cost" benefits do not constitute ERISA welfare benefit plans. 1997 WL 538933, at *6. The benefit at issue in *Preuc* was free air travel given to former employees on a non-guaranteed, space-available basis only. The Schwegmann grocery vouchers were not a "no additional cost" benefit and employees were guaranteed to be able to purchase groceries with the vouchers each month. In contrast, if Schwegmann had merely offered to give retirees access to whatever, if any, damaged or discarded products that had been earmarked for disposal, then the benefit would have been analogous to the one at issue in *Preuc*.

One obvious point is that by its own terms the regulation applies where the specific benefit involved is the *sale* of goods by the employer to its employees. *See Smith v. Jefferson Pilot Life Ins. Co.*, 14 F.3d 562 (11th Cir.1994). Thus, by way of example, if Schwegmann had established a program that allowed retirees to use their own funds to purchase groceries at a discounted rate, then the regulation would likely preclude coverage of that benefit by ERISA. The voucher program, however, was much more than a mere offer to sell groceries to employees. Rather, the benefit conferred under the voucher program included the equivalent of cash spending power when the vouchers were used in the Schwegmann stores. Thus, Schwegmann didn't just offer goods for sale to its employees—it provided them with the means to pay for them. Unlike a benefit limited only to the sale of groceries to employees, the Schwegmann grocery voucher benefit was a supplement to the retiree's monthly income because the retiree did not have to use his own money to buy groceries. Also, as noted above, several plaintiffs testified that they had received cash change back when using the vouchers, something that could not happen if the Schwegmann benefit were limited to a mere offer of goods for sale. Accordingly, the Court finds that regulation 2510.3-1(e) does not preclude a finding that the grocery voucher program was an ERISA pension plan.

### b. Did Schwegmann establish or maintain a benefit plan?

#### i. Lack of a formal writing and publication

█ ERISA's definition of a plan "establishes no requirement that a 'plan' meet any specific formalities or that there be some policy manual or employee handbook to effectuate it." *Fort Halifax*, 482 U.S. at 24, 107 S.Ct. at 2224 (Rehnquist, C.J., White, O'Connor, Scalia, JJ., dissenting). Although ERISA imposes a duty on plan fiduciaries to establish and maintain a plan according to a "written instrument," those responsibilities arise only once it has been determined that ERISA covers the employer's plan. *Memorial Hosp. Sys.*, 904 F.2d at 241 (citing 29 U.S.C. § 1102(a)(1)). Fulfillment of that particular fiduciary duty is not itself a prerequisite to coverage. *Id.* (citing *Dillingham*, 688 F.2d at 1372). A multitude of courts, including our own Fifth Circuit, have held that lack of a written plan or any writing at all for that matter, is no impediment to establishment of a plan covered by ERISA. *See, e.g., Memorial Hosp. Sys.*, 904 F.2d at 241 (Fifth Circuit); *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 811 (7th Cir.1994) (Seventh Circuit); *Dillingham*, 688 F.2d at 1372 (Eleventh Circuit); *Scott*, 754 F.2d at 1503 (Ninth Circuit); *Moeller*, 801 F.Supp. at 294 (district court in Eighth Circuit); *Hollingshead v. Burford Equip. Co.*, 747 F.Supp. 1421, 1428 (M.D.Ala.1990). As the Fifth Circuit has noted, to hold otherwise would allow employers to evade ERISA by merely failing or refusing to memorialize their employee benefit programs in a separate document. *Memorial Hosp. Sys.*, 904 F.2d at 241.

Accordingly, as a matter of law, the Court finds that the Schwegmann grocery voucher program cannot escape ERISA by virtue of the fact that Schwegmann did not reduce it to a formal writing. Nonetheless, the Warnke memorandum, while informal and not intended for publication, is nevertheless a writing that evidences the plan. *See Whitfield*, 935 F.Supp. at 828 (finding that an informal intra office memorandum was a writing evidencing a plan).

The Court also rejects defendants' contention that ERISA is inapplicable because Schwegmann did not "advertise" the pro-

gram to its employees during their active employment. First of all, as noted in the Court's Findings of Fact, *supra*, the voucher program was common knowledge among Schwegmann employees, and all retirees who met the program criteria did in fact receive vouchers. And given the informal way that personnel matters were handled in the Schwegmann partnership, and that no benefit manual or handbook was ever finalized and distributed to the employees even for other types of benefits, Schwegmann's failure to formally convey information to its employees about the voucher program demonstrates little, much less that Schwegmann employees were unreasonable in assuming that they too would receive vouchers if they met the criteria.

In *Brown v. Ampco–Pittsburgh Corp.*, the Eleventh Circuit addressed employee rights in light of an employer's failure to publicize an ERISA severance plan. 876 F.2d 546, 550–51 (6th Cir.1989). The terms of the plan were not distributed to employees or published in the personnel manual, but instead appeared only in a confidential internal memorandum addressed to certain management personnel. When AMPCO terminated certain employees they claimed severance benefits pursuant to the terms contained in the memorandum. AMPCO attempted to argue that "a silent plan communicates no offer," and without an offer there can be no acceptance and thus no contract. *Id.* at 550.

The Eleventh Circuit rejected that argument concluding that a "silent" plan does not preclude an employee's reliance on the plan for benefits. *Id.* at 551. Using similar reasoning to that used by courts when rejecting the formal writing requirement, the court reasoned that ERISA operates

notwithstanding an employer's failure to comply with its disclosure mandates. *Id.* The court concluded that it would be antithetical to ERISA's purposes to allow an employer to deny benefits on the ground that it never communicated the plan to affected employees. *Id.* The Court finds the reasoning employed by the *Brown* court persuasive.

#### ii. *Dillingham* factors

 The prevailing test for determining whether an employer has "established" an ERISA plan was set out by the Eleventh Circuit in *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982) (en banc). According to *Dillingham*, an ERISA plan is established "if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Memorial Hosp. Sys.*, 904 F.2d at 240 (citing *Dillingham*, 688 F.2d at 1373). The *Dillingham* test has been adopted by most appellate courts including the Fifth Circuit. *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 977 (5th Cir.1991); *Memorial Hosp. Sys.*, 904 F.2d at 240–41.[19] Further, the Supreme Court has held that the term "plan" inherently requires that benefits be paid pursuant to an "administrative scheme" for processing and disbursing benefits. *See Fort Halifax*, 482 U.S. at 12, 107 S.Ct. at 2218.

#### *Intended Benefits and Class of Beneficiaries*

 The Schwegmann retirement voucher program clearly satisfies the first two *Dillingham* factors which require an ascertainable benefit and class of beneficiaries. The intended benefit for the

---

**19.** Although the *Dillingham* test was originally developed and applied in the context of *welfare* plans, other courts have noted its ap-plicability to *pension* plans as well. *See, e.g., Hollingshead*, 747 F.Supp. at 1427 n. 1.

plaintiff class was $216 dollars per month of purchasing power in the Schwegmann stores conferred in the form of grocery vouchers. In Mr. Spitelera's case, the intended benefit was $305 per month paid in cash.[20] The class of intended beneficiaries, regardless of whether the payment was in vouchers or cash, was expressly defined in the Warnke memorandum as those employees who retired on or after age 60, who had attained 20 years of service, and who had held a supervisory or equivalent position for at least one year. In practice, it was that class of beneficiaries that in fact received benefits. Further, although defendants attempted to argue that the benefits were given on an ad hoc or discretionary basis only after specific approval from Mr. Schwegmann or Mr. Levy, the evidence showed that all employees who met the criteria, with the exception of Mr. DeCuir and Ms. Dominick as discussed above, did in fact receive the retirement grocery vouchers. Accordingly, the Court finds that the voucher program satisfies the first two *Dillingham* factors.

### Procedures for Receiving Benefits and Administrative Scheme

Nor is there any dispute that the Schwegmann voucher program functioned pursuant to a full complement of ongoing administrative procedures. Those procedures, discussed in the Court's Finding of Fact, *supra*, included an initiation process beginning with the retiring employee's supervisor and ending with final approval from either Mr. Schwegmann or Levy. On behalf of those retirees participating in the program, vouchers were typed-up, signed, mailed out, reconciled upon redemption, and filed away each month by Mr. Lemoine and his staff. That the procedures

were informal does not deter ERISA as long as the procedures are ascertainable. *Williams,* 927 F.2d at 1544. In this case the procedures for processing claims and paying benefits are clearly ascertainable.

The foregoing discussion also demonstrates that the voucher benefit was processed pursuant to an "administrative scheme." *See Fort Halifax,* 482 U.S. at 9, 107 S.Ct. at 2220; *Delaye v. Agripac, Inc.,* 39 F.3d 235 (9th Cir.1994). The Schwegmann grocery vouchers were received without interruption on an ongoing basis for life. Unlike the benefit program in *Fort Halifax,* which the Supreme Court found was not a plan, the Schwegmann grocery voucher program was not a one-time obligation that arose at the termination of employment. Rather, to facilitate disbursement of the vouchers on a monthly basis, key members the Schwegmann organization regularly engaged in a panoply of "administrative activity." *Fort Halifax,* 482 U.S. at 14, 107 S.Ct. at 2219. Accordingly, the Schwegmann grocery voucher program satisfied the third *Dillingham* factor which requires ascertainable procedures, as well as the "administrative scheme" test announced by the Supreme Court in *Fort Halifax.*

### Source of Funding

It is undisputed that the Schwegmann voucher plan was paid from an ascertainable source of funds, *i.e.,* the partnership's general revenues. The question is whether a plan is covered by ERISA when its benefits are paid out of the employer's general revenues as opposed to a separate fund. Although ERISA requires employers to fund pension plans, ERISA's definition of a pension benefit plan does not require a separate fund as a prerequi-

---

**20.** A single beneficiary does not preclude the finding of an ERISA pension plan. *See Williams,* 927 F.2d at 1545 (finding that the term "class" does not require multiple beneficiaries because nothing in ERISA precludes a plan covering a single employee).

site for existence. *See* 29 U.S.C. § 1002(2)(A).

Other courts have found that ERISA covers benefits paid from unfunded plans, *see, e.g., Williams,* 927 F.2d at 1544; *Gilbert v. Burlington Indus., Inc.,* 765 F.2d 320 325 (2d Cir.1985); *Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1145–46 (4th Cir.1985); *Diak,* 33 F.3d at 813; *Scott,* 754 F.2d at 1503; *Moeller,* 801 F.Supp. at 294, including unfunded pension plans, *Carrabba v. Randalls Food Markets, Inc.,* 145 F.Supp.2d 763, 769 (N.D.Tex.2000), *aff'd,* 252 F.3d 721 (5th Cir.2001) *(per curiam ).* A common theme emerges from the reasoning employed by these courts: An employer's failure to comply with ERISA's funding mandate should not exempt the plan from ERISA's regulation because to hold otherwise would allow the employer's malfeasance to deprive employees of the protections to which they would otherwise be. entitled. *See, e.g., Moeller,* 801 F.Supp. at 294 (citing *Williams,* 927 F.2d at 1544).

The United States Supreme Court has never squarely addressed the issue of whether a *pension* plan must be funded in order to be regulated by ERISA. However, in *Fort Halifax,* while deciding an issue of ERISA preemption, the Court strongly intimated that a *welfare* plan funded from general assets would be an ERISA plan. 482 U.S. at 16, 107 S.Ct. at 2220. Summarizing from circuit court cases that had so held, the Court noted that to find otherwise, would enable the employer to evade ERISA merely by paying benefits out of general assets—a result inconsistent with the purpose of ERISA. *Id.* at 18, 107 S.Ct. at 2221.

Just a short time later, the Court "muddied" the issue when it decided *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), and later *California Division of Labor Standards Enforcement v. Dillingham Construction, Inc.,* 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). Without so much as a mention of its discussion of funding in *Fort Halifax,* the Court rejected ERISA coverage in the case of unfunded *welfare* benefit plans. *See Morash,* 490 U.S. at 115, 109 S.Ct. at 1673 (unused vacation pay); *Dillingham Constr., Inc.,* 519 U.S. at 326–27, 117 S.Ct. at 838–39 (apprenticeship program). In both of those cases, the Court noted that Congress's primary concern when enacting ERISA was with mismanagement of funds accumulated to finance employee benefits and the employer's failure to pay benefits from *accumulated* funds. *Dillingham Construction,* 519 U.S. at 326–27, 117 S.Ct. at 838–39; *Morash,* 490 U.S. at 116, 109 S.Ct. at 1673. The Court saw no distinction between the risk of defeated expectations from an employer's failure to pay the type of welfare benefit involved in those cases and the defeated expectations associated with an employer's failure to pay wages for services performed. *Dillingham Construction,* 519 U.S. at 326–27, 117 S.Ct. at 838–39; *Morash,* 490 U.S. at 116, 109 S.Ct. at 1673. And because Congress had no interest in allaying the defeated expectation of an employer's failure to pay current wages when it enacted ERISA, the unfunded welfare benefits in those cases were not part of an ERISA welfare benefit plan. *Id.*

Although *Fort Halifax, Morash* and *Dillingham Construction* have done little to clarify the scope of ERISA vis-à-vis unfunded benefit plans, this Court concludes that those cases do not directly apply to the Schwegmann case because the Schwegmann plan involved *pension* benefits, not *welfare* benefits. Under ERISA, funding for pension plans is a mandate, not an option (as in the case of welfare benefits). Thus, to impose a threshold requirement for ERISA coverage that depends

solely on the employer having followed the law, would be contrary to Congress's goal of providing maximum protection to employees. Further, Congress was far more solicitous of pension plans when it designed ERISA, subjecting them to far more extensive regulation than welfare plans.

Additionally, the reasoning employed by the Court in *Morash* and *Dillingham Construction* really has little application in the context of a pension plan. The risk of defeated expectation associated with an employer's failure to pay pension benefits at retirement is worlds apart from that associated with an employer's failure to pay wages due. While any employee would be disappointed to forfeit current wages due in the short term, that disappointment quickly pales when compared to the potentially devastating and emotionally shattering long-term effect of the employer's failure to pay pension benefits at retirement. Such an occurrence can wreak financial havoc upon the retiree and his family by destroying a lifetime of planning for the retirement years. Retirement typically occurs at an age where one no longer has the option to start all over again in hopes of obtaining a new pension. Thus, pension benefit plans involve a wholly different type of defeated expectation from the one the Supreme Court was concerned with in *Morash* and *Dillingham Construction.*

And because pension benefits are at issue in this case, another one of Congress's primary motivations for enacting ERISA is relevant, one which the Supreme Court had no reason to consider in *Morash* and *Dillingham Construction.* Namely, one of Congress's other primary focuses in enacting ERISA was to prevent the "great personal tragedy" suffered by employees whose retirement benefits were not paid by ensuring that workers who fulfilled the requirements of a defined pension benefit plan actually received it upon retirement. *Nachman Corp.,* 446 U.S. at 374–75, 100 S.Ct. at 1732–33. In light of that specific goal, which goes to the very heart of what Congress had hoped to accomplish with ERISA, this Court agrees with those courts that have refused to allow an employer to deprive its employees of the protections Congress intended by failing or refusing to fund a pension plan. To allow an employer to violate ERISA's pension funding mandate and then subsequently use that violation as a shield to deny benefits, would be an absurd result given that Congress's paramount purpose in enacting ERISA was to protect employees.

Given that the *Morash* and *Dillingham Construction* Courts did not expressly overrule or denounce the statements made in *Fort Halifax,* and given that all of those cases involved welfare benefits plans which invoke an entirely different set of concerns and far less ERISA regulation than pension plans, the Court is not bound to conclude that lack of separate fund precludes ERISA coverage of a pension plan. In sum, the Court concludes that the Schwegmann voucher program was paid from an ascertainable source of funding, the partnership's general revenues. That the benefits were paid from general revenues and not from a separate fund does not preclude ERISA coverage.

Having found that the Schwegmann voucher program had ascertainable benefits, beneficiaries, procedures for administration, and a source of funding, the Court concludes that Schwegmann did in fact establish and maintain an ERISA pension benefit plan. That plan provided retirement income to the Schwegmann retirees. Schwegmann's failure to reduce the plan to writing or to fund it cannot operate to deprive plaintiffs of the protections they are due under ERISA. Given that the

benefits were paid by Schwegmann, the employer, and that Schwegmann was unarguably an employer engaged in commerce, all of the requisites for ERISA coverage are met. *See* 29 U.S.C. §§ 1002(2)(A)(I), 1003(a). The Schwegmann grocery voucher plan was a pension benefit plan covered by ERISA.

### c. Does Mr. Schwegmann's Characterization of the Voucher Program as a Gratuity Affect ERISA Plan Status?

Throughout this litigation, Mr. Schwegmann has maintained that the grocery voucher program was intended as a gratuity to his employees subject to termination at any time. Prompted by a desire to show his appreciation to his loyal employees, he conceived of the of the voucher program as a way to ensure that his long term employees would never be without food, a basic necessity of life. He has pointed out that the grocery business was sold, and the voucher program terminated, due to financial hardship as opposed to any selfish or avaricious motive.

Although Mr. Schwegmann was not legally obligated to implement the voucher program, the Court cannot agree that the program was completely gratuitous in nature. The vouchers were given in return for years of loyal service to Mr. Schwegmann's grocery business. The Schwegmann partnership also availed itself of advantageous tax treatment by deducting the vouchers as a business expense. Evidence such as Mr. Janies' letter to the Social Security Administration and the forms 1099–R issued to the employees are objective evidence tending to show that Schwegmann treated the vouchers as a form of compensation rather than a gratuitous payment, *i.e.*, something for which the Schwegmann partnership received no benefit in return. In fact, the record contains no objective evidence that Schwegmann considered the voucher program a gratuity.

Nevertheless, the Court has no reason to doubt Mr. Schwegmann's sincerity and his contention that he personally considered the voucher program to be a gratuity terminable at will. But where ERISA coverage is concerned, Mr. Schwegmann's well-meaning intentions are without legal significance. *See Modzelewski*, 14 F.3d at 1377 (employer can establish a de facto pension plan notwithstanding intent to the contrary); *Carrabba v. Randalls Food Markets, Inc.*, 38 F.Supp.2d 468, 478 (N.D.Tex.1999) (good intent and lack of improper motive cannot prevent ERISA coverage).

However, assuming *arguendo* that the voucher program was completely gratuitous in nature, Department of Labor regulation 29 C.F.R. § 2510.3–2(e) refutes any defense based upon Mr. Schwegmann's characterization of the grocery vouchers as a gratuitous benefit. Regulation 29 C.F.R. § 2510.3–2(e) addresses gratuitous payments by an employer to its retirees. According to that regulation, voluntary, gratuitous payments to former employees do *not* constitute a pension plan if, among other requirements, the employee separated from service prior to September 2, 1974, and the payments commenced prior to that date. 29 C.F.R. § 2510.3–2(e)(2), (3). The Department of Labor asserts that this regulation is meant to clarify that any gratuitous payment plan that fails to meet the criteria listed, *will* constitute a pension plan. DOL Opinion No. 76–66, 1976 WL 5089 (E.R.I.S.A.). The Eleventh Circuit considered the regulation and this opinion letter and found that they strongly imply that any gratuitous plan not within the exclusion, *is* an ERISA plan. *Williams*, 927 F.2d at 1548. Given that the Schwegmann voucher program did not

begin until 1985, it satisfies neither of the two criteria listed above, and therefore, cannot fall within the exclusion. Accordingly, Mr. Schwegmann's characterization of the program as a gratuitous benefit cannot defeat ERISA coverage.

## II. Causes of Action and Relief Available to Plaintiffs

Benefit plan participants and beneficiaries have "a panoply of remedial devices" available to them under ERISA. *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989) (quoting *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). ERISA contains "six carefully integrated civil enforcement provisions," *Russell,* 473 U.S. at 147, 105 S.Ct. at 3092, three of which have potential relevance under the facts of this case. Those three provisions, which form part of section 502 of ERISA, provide that a participant or beneficiary may bring a civil action to:

(1) recover **benefits** due to him under the terms of his **plan,** to enforce his rights under the terms of the plan, or to clarify his right to future benefits under the terms of the plan;

29 U.S.C. § 1132(a)(1)(B) (emphasis added).

(2) obtain appropriate relief under section 1109 [liability for **breach of fiduciary duty**];

29 U.S.C. § 1132(a)(2).

(3) obtain other appropriate **equitable relief** in order to redress violations of ERISA or the terms of the plan, or to enforce any provisions of ERISA or the terms of the plan.

29 U.S.C. § 1132(a)(3)(B)(i), (ii) (emphasis added).

### 1. Plaintiffs' Claims for Benefits

■■ Section 1132(a)(1)(B), *supra,* gives plaintiffs, in their capacity as plan participants,[21] a cause of action against the plan for benefits. ERISA does not dictate the benefits to be afforded once a plan is created, rather only the terms of the plan itself can create an entitlement to benefits. *Hein v. FDIC,* 88 F.3d 210, 215 (3d Cir. 1996) (citing *Dade v. North Amer. Philips Corp.,* 68 F.3d 1558 (3d Cir.1995)). Thus, section 1132(a)(1)(B) deals exclusively with contractual rights under the plan. *Varity Corp. v. Howe,* 516 U.S. 489, 521 n. 2, 116 S.Ct. 1065, 1082, 134 L.Ed.2d 130 (1996) (O'Connor, Scalia, Thomas, JJ., dissenting); *see Firestone Tire & Rubber,* 489 U.S. at 113, 109 S.Ct. at 956 (citing *Russell,* 473 U.S. at 148, 105 S.Ct. at 3093).

■■ Given that an ERISA plan has the procedural capacity to be sued, 29 U.S.C. § 1332(d)(1), it is well-recognized that the proper party defendant to a section 1132(a)(1)(B) claim for benefits is the plan itself and not the employer.[22] *See, e.g., Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1287 (9th Cir.1990). Further, under ERISA's express terms, any money judgment obtained against the plan is enforceable only against the plan as an entity and is not enforceable against

---

**21.** "Participant" includes any employee or former employee of an employer who is or may become eligible to receive a benefit of any type from an employee benefit plan. 29 U.S.C. § 1002(7). Plaintiffs' status as "participants" is not challenged for purposes of standing in this suit.

**22.** Some circuits hold that the plan administrator and trustees, as well as the plan can be liable for benefits. *See, e.g., Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir.1998). The Fifth Circuit implicitly rejected that approach in *Todd v. AIG Life Insurance Company,* 47 F.3d 1448 (5th Cir.1995) (holding that the plan administrator is not liable for benefits rather only for breach of fiduciary duty).

any other person unless liability against such person is established in his individual capacity. 29 U.S.C. § 1132(d)(2).

 However, where the employer is the plan administrator and the employer and the plan are otherwise "closely intertwined," plaintiff may state a cause of action against the employer for benefits due. *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864 (7th Cir.2001) (citing *Mein v. Carus Corp.*, 241 F.3d 581 (7th Cir.2001); *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549 (1997)). In *Slaughter v. AT & T Information Systems, Inc.*, 905 F.2d 92, 94 (5th Cir.1990), the Fifth Circuit endorsed this approach where an ERISA plan has no existence apart from the corporate employer and is an unfunded benefit plan self-administered by the employer. In such a situation, the plan is merely a nominal defendant with the true party in interest being the employer. *See id.*

Plaintiffs in this case have sued both their former employer, Schwegmann partnership, and the grocery voucher plan, which they designated as SGSM Pension Plan ("the Plan") for benefits. By operation of law, the Schwegmann partnership was both the plan sponsor, 29 U.S.C. § 16(B) ("plan sponsor" means the employer in the case of a plan established by a single employer), and the plan administrator, *id.* § 1002(16)(A) (the plan "administrator" is the plan sponsor if an administrator is not designated by the written plan instrument). The Plan was unfunded, paid from the partnership's assets, and completely controlled and administered by officers and employees of the partnership. The undisputed facts of this case show that the Plan had no existence apart from the SGSM partnership in its capacity as employer. Accordingly, the Court concludes that under the facts of this case, plaintiffs may recover the benefits they are owed directly from the Schwegmann partnership.[23]

Under Louisiana partnership law, the partnership entity is primarily liable for its debts, however, the individual partners are secondarily liable and bound for their virile share. La. Civ.Code art. 2817. Accordingly, SGSM, Inc., G.G. Schwegmann Company, and the John Schwegmann, Jr. Trust Estate, as the constituent partners of the Schwegmann partnership, are liable for their virile shares of any liability faced by the Schwegmann partnership.

### 2. *Plaintiffs' Claims for Fiduciary Breach*

#### a. *Plan fiduciaries*

ERISA defines a plan fiduciary as any person

[T]o the extent (I) he **exercises** any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he **has** any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A) (West 1999) (emphasis added).

 As the definition implies, Congress defined "fiduciary" not in terms of formal title or designation but in *functional* terms of control and authority over the plan. *Varity Corp.*, 516 U.S. at 527, 116

---

**23.** Although the Schwegmann partnership entity and its constituent partners (including SGSM, Inc.) are liable for benefits, Mr. Schwegmann, faces no personal liability for SGSM, Inc.'s debt, absent some basis for piercing the corporate veil, solely by virtue of his status as an officer, board member, or shareholder of SGSM, Inc. *See Rockney v. Blohorn*, 877 F.2d 637 (8th Cir.1989).

S.Ct. at 1085 (O'Connor, Scalia, Thomas, JJ., dissenting) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)); *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir.1984). Thus, a formal appointment as trustee or other plan fiduciary is not a prerequisite to fiduciary status. *Mercer*, 747 F.2d at 309. A person's state of mind or belief as to his or her fiduciary status under ERISA is not determinative when his acts fall under the broad fiduciary definition. *Id.* at 309 n. 4. The Fifth Circuit has noted that this nonrestrictive definition evidences Congress's intent to construe the term "fiduciary" under ERISA very broadly. *See Mercer*, 747 F.2d at 308. ERISA fiduciary status is not limited to individuals—a corporation, partnership, or other business entity, including the plan sponsor, can be an ERISA fiduciary. *See* 29 U.S.C. § 1002(9) ("person" includes individual, partnership, or corporation); *id.* § 1002(21)(A) ("fiduciary" defined); *Varity Corp.*, 516 U.S. at 505, 116 S.Ct. at 1074.

▇▇ Under the foregoing principles, Mr. Schwegmann and the Schwegmann partnership are unarguably plan fiduciaries. The partnership is a fiduciary both functionally and by way of its status as the plan administrator. The Schwegmann partnership exercised and had plenary control over the administration of the Plan and its assets putting it squarely within the broad definition of an ERISA fiduciary for those acts performed in conjunction with that status. *See Varity Corp.*, 516 U.S. at 498, 116 S.Ct. at 1071 (recognizing that when the employer-corporation serves as a plan fiduciary, not every aspect of its business activities will involve plan management and administration).[24]

Mr. Schwegmann's status as a plan fiduciary arises out of the discretion and direct control that he exercised and/or had over the Plan's administration and assets, bringing him squarely within section 1002(21)(a)'s definition of a plan fiduciary. The Court recognizes that Mr. Schwegmann likely exercised that control and authority while acting in his official capacity as a corporate officer of SGSM, Inc. However, under the broad scope of the ERISA fiduciary definition, corporate employees and officers who fit under section 1002(21)(a), while nevertheless acting on behalf of a corporate entity, face potential fiduciary liability in their individual capacities with no necessity of piercing the corporate veil. *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1461 (9th Cir.1995). A contrary approach would ignore "[t]he broadly based liability policy underpinning ERISA and its functional definition of 'fiduciary,'" and allow a corporation "to shield its decision-makers from personal liability" in contravention of what Congress intended in ERISA.[25] *See id.*

### b. *Fiduciary duties breached*

Section 1104 outlines the standard of care that fiduciaries owe to the plan in-

---

**24.** The Fifth Circuit has previously held that an ERISA plan cannot be a fiduciary to itself. *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir.1995). Although equity requires that the Plan and the Schwegmann partnership be treated as one vis-à-vis a benefits claim, it does not follow that they should be treated as one for purposes of avoiding fiduciary status.

**25.** This approach has been rejected by the Third Circuit. In that circuit, *where the plan expressly names a corporation as a fiduciary*, officers who exercise discretion on behalf of the corporation are not fiduciaries unless it can be shown that they have individual discretionary roles as to plan administration, or have misused the corporate form leading to piercing of the corporate veil. *Confer v. Custom Engineering Co.*, 952 F.2d 34, 37 & n. 4 (3d Cir.1991). Unlike the *Confer* case, there was no written plan to expressly designate a corporate entity or the Schwegmann partnership, as opposed to Mr. Schwegmann, as plan fiduciary.

cluding that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. § 1104(a)(1)(B).

 In addition to the standard of care imposed by section 1104, ERISA also imposes several specific statutory duties upon plan fiduciaries. The principal duties that ERISA imposes on plan fiduciaries involve the management of plan assets, the maintenance of records, disclosure of specified information, and avoidance of conflicts of interest. *Varity,* 516 U.S. at 526 n. 5, 116 S.Ct. at 1084 (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). Those duties include establishment of the plan pursuant to a written instrument, 29 U.S.C. § 1102(a)(1), preparation of a summary plan description, *id.* § 1022, disclosure and reporting of certain plan information, *id.* § 1021, and retention of certain records, *id.* § 1027. Of paramount importance under the facts of this case, however, are the requirements that an ERISA pension plan satisfy minimal funding requirements, *id.* § 1082, and that the plan's assets be held in trust, *id.* § 1103.

 Because the retirement grocery voucher program was not intended to be covered by ERISA, Mr. Schwegmann and the partnership did not comply with any of the ERISA duties outlined above. Because the fiduciary standard is an objective one, the fiduciary's subjective belief and good faith are not determinative of whether a breach has occurred. *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917–18 & n. 3 (8th Cir.1994) (citing *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.1984)).

Of all of the duties breached, however, it was the failure to fund the pension plan that ultimately caused plaintiffs' injury. The ability to fund the pension plan was a fiduciary duty uniquely within the discretion exercised by Mr. Schwegmann and the partnership. While the decision to terminate a pension plan is not in and of itself a fiduciary breach, where vested or accrued benefits are involved, the employer will commit a fiduciary breach when the plan termination deprives participants of their vested and accrued benefits. *See, Izzarelli v. Rexene Prods. Co.,* 24 F.3d 1506, 1524 (5th Cir.1994). Given that Mr. Schwegmann and the partnership did not fund the Plan, and terminated it without providing for protection of the plaintiffs' vested rights, they breached their duties as ERISA fiduciaries.

### c. Plaintiffs' remedy for fiduciary breach

Section 1109 imposes liability for breach of fiduciary duty, and provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be *personally liable* to make good to such plan *any losses to the plan* resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate. . . .

29 U.S.C.A. § 1109 (West 1999) (emphasis added).

Section 1109(a) only creates liability—in order to enforce the rights and obtain the remedies created by section 1109, plaintiff must bring suit under the appropriate civil enforcement mechanism provided in section 1132(a). *Varity Corp.,* 516 U.S. at

518, 116 S.Ct. at 1080 (O'Connor, Scalia, Thomas, JJ., dissenting).

### Section 1132(a)(2)

■ Section 1132(a) has two provisions, recited *supra*, that can be used to redress breaches of fiduciary duty. Section 1132(a)(2) gives a participant standing to sue the fiduciary for breach and obtain "appropriate relief" under section 1109. Appropriate relief under section 1109 expressly includes liability for any losses that result from the breach. However, in *Massachusetts Mutual Life Insurance Co. v. Russell*, the Supreme Court held that recovery for fiduciary breach sought under section 1132(a)(2), inures to the benefit of the plan, and not to the individual participants. 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985). Thus, while participants, such as plaintiffs in this case, have standing to sue the fiduciary for the losses caused by his breach, they can do so only in a representative capacity on behalf of the plan. *See id.* at 142 n. 9, 105 S.Ct. at 3090.

### Section 1132(a)(3)(B)

■ The final path that plaintiffs' may follow in their quest for redress is via section 1132(a)(3)(B). This section allows for other appropriate **equitable relief** in order to redress violations of ERISA's mandates or the terms of the plan. In *Varity Corporation v. Howe*, the Supreme Court held that this provision allows individual participants, on their own behalf, to sue plan fiduciaries when they breach their fiduciary duties. 516 U.S. at 510, 116 S.Ct. at 1076–77. However, because the express terms of the enforcement provision limit recovery to **equitable relief**, plaintiffs cannot recover money damages under section 1132(a)(3)(B). Nevertheless, restitution is a form of equitable "monetary" relief that plan participants can recover under section 1132(a)(3)(B). *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 253, 120 S.Ct. 2180, 2191, 147 L.Ed.2d 187 (2000); *see, e.g., Ream v. Frey*, 107 F.3d 147, 152–53 (3d Cir.1997); *In re Unisys Corp.*, 57 F.3d 1255, 1269 (3d Cir.1995).

■ Section 1132(a)(3)(B) is typically invoked as a "safety net" where plaintiffs have no remedy under any of the other ERISA enforcement provisions. *See, e.g., Ream*, 107 F.3d at 152. Where plaintiff would otherwise have no remedy at all, the Supreme Court has reasoned that no ERISA-related purpose would be served by precluding a remedy under this broadly-defined section. *Varity Corp.*, 516 U.S. at 516, 116 S.Ct. at 1079. However, where plaintiff has another remedy, relief under this section is not "appropriate" because plaintiff's relief will be adequate without the need for further equitable relief. *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 385 (4th Cir.2001) (citing *Varity*, 516 U.S. at 515, 116 S.Ct. at 1065).

Because the Court has concluded that plaintiffs have a remedy to recover benefits under section 1132(a)(1)(B), equitable relief under section 1132(a)(3)(B) is not necessary to redress plaintiffs' injury.[26]

---

**26.** If relief were otherwise unavailable, the Court would award plaintiffs restitutionary damages sufficient to make them whole pursuant to section 1132(a)(3)(B). A monetary award to make plaintiff whole for the loss of benefits that would otherwise be due under an ERISA plan is restitutionary, and thus equitable in nature, when the loss results from a breach of fiduciary duty and recovery is sought against the fiduciary. *See Strom v.*

*Goldman, Sachs & Co.*, 202 F.3d 138, 143–50 (2d Cir.1999); *Ream*, 107 F.3d at 152–153; *Dunnigan v. Metropolitan Life Ins. Co.*, 99 F.Supp.2d 307, 320–21 (S.D.N.Y.2000); *Carrabba*, 145 F.Supp.2d at 770–71 (finding that equity served by placing plaintiffs in basically the same financial position they would have been in if the employer had complied with minimal vesting and accrual provisions of ERISA notwithstanding no bad faith on the

## III. Relief

■ Based on the foregoing analysis, the Court concludes that all retirees who were actually receiving grocery vouchers when the Plan terminated are entitled to the relief stipulated by the parties in Exhibits 36a and b (Group A). For Group B1 (20 years service, supervisor, age 60 as of plan termination but not actually receiving vouchers because not retired), the Court finds that benefits should be calculated as of March 1, 1997, when all members of that group were in effect forced to retire. For Group B2 (20 years service, supervisor, not yet age 60 as of plan termination and therefore not actually receiving vouchers) the Court concludes that the latter of March 1, 1997, or attainment of age 60 is the appropriate point in time to begin the lump sum calculation. The Court finds age 60 to be the appropriate age for employees in Group B2 because that was the age specified in the Plan. Mr. Spitelera is entitled to the relief stipulated to by the parties. Exhibit 36a and b.

In order for the Court to calculate the total award which should be made to the class as a whole,[27] the only fact issue remaining pertains to eligibility for relief of those employees in Exhibit 36's Groups C1 and C2 (20 years service, under and over age 60) because it is unclear whether individual members of those groups satisfy the supervisor requirement under the Plan. On this issue, the Court **ORDERS** counsel to confer and submit to the Court a joint proposal for a method for determining the supervisor status of those "questionable" former employees. The proposal is to be submitted to the Court no later than *Thursday, September 20, 2001.* If counsel cannot agree on a joint proposal, then the parties can submit their own and the Court will either select one of those submitted or fashion one of its own.

■ Pursuant to 28 U.S.C. § 1961(a), plaintiffs are entitled to an award of post-judgment interest. ERISA is silent on the issue of pre-judgment interest but the Court in its discretion can make such an award. *See Hansen,* 940 F.2d at 983–84. When awarding pre-judgment interest on an ERISA claim, it is appropriate for the court to look to state law for guidance as to the appropriate rate. *Id.* Nevertheless, the state law rate is not binding and it remains within the district court's discretion to select an equitable rate of pre-judgment interest. *Id.* (citing *Dallas–Fort Worth Reg. Airport Bd. v. Combustion Equip. Assocs., Inc.,* 623 F.2d 1032 (5th Cir.1980)).

Looking to Louisiana law, the law of the situs of plaintiff's employment, *Roig v. Limited Long Term Disability Program,* 2000 WL 1146522 (E.D.La. Aug.4, 2000), the Court will award plaintiffs pre-judgment interest at the rate set in La. Civil Code article 2924 and La. R.S. 13:4202 in effect on March 1, 1997 (9.25%), beginning

---

part of the plan or employer); *cf. Rogers v. Hartford Life & Accident Ins. Co.,* 167 F.3d 933, 944 (5th Cir.1999) (after *Mertens,* section 1132(a)(3)(B) does not permit recovery of *extra-contractual* compensatory damages designed to make plaintiff whole). Under section 1132(a)(3)(B), the partnership and Mr. Schwegmann, as a result of their breach of fiduciary duty, would be liable to plaintiffs for restitution in an amount equal to the loss of their vested retirement benefits.

27. The parties have stipulated that certain calculations by plaintiff's actuary, Steve Osborn, as reflected in Exhibit 36(a), are the appropriate amounts for any award in this case. Using age 60 as the retirement age, and assuming that all class members in the "questionable" category are found qualified to receive benefits, the total lump sum present value of the entire class claim as of August 1, 2001 is $4,155,522. This sum does not include interest on past due benefits.

that same date and continuing through the date of final judgment.

Finally, under ERISA, "the court in its discretion may allow a reasonable attorney's fee and costs of action...." 29 U.S.C. § 1132(g)(1). In the Fifth Circuit, there is no "presumption" in favor of awarding costs and attorneys' fees. *Todd v. AIG Life Insurance Company*, 47 F.3d 1448, 1458–59 (5th Cir.1995). Such an award, as the statute states, is purely discretionary, but the trial court must exercise its discretion by considering the five *Bowen* factors. *Todd*, 47 F.3d at 1458, citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.1980).

■ Under *Bowen*, the court considers: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position. *Bowen*, 624 F.2d at 1266.

In this case, the Court has considered the five *Bowen* factors and has decided to exercise its discretion under the statute to award reasonable attorneys' fees and costs to plaintiffs. As to the first *Bowen* factor, the Court does not find any bad faith on the part of the defendants. With respect to the second factor, the Court is uncertain at this time as to whether or not the defendants have the ability to satisfy an award of attorneys' fees. Insofar as the third factor, however, there is no doubt that an award of attorneys' fees in this case would be a deterrent for other persons acting under similar circumstances. Moreover, the fourth factor especially weighs in favor of awarding attorneys' fees because plaintiffs in this class action sought to benefit all participants in the Schwegmann retirement grocery voucher plan. Finally, considering the degree of success attained by plaintiffs, the relative merits of the parties' position also weighs in favor awarding attorneys' fees in this case. Following entry of a final judgment, counsel for plaintiffs shall file a motion for attorneys' fees and costs, pursuant to Federal Rule of Civil Procedure 54(d).

## IV. Insurance Coverage

■ USF&G provided an Excess Liability Policy to the various Schwegmann entities. Exhibit 16. That policy included Excess Employee Benefits Liability ("EEBL") Coverage pursuant to the following insuring agreement:

> We will pay "ultimate net loss" in excess of the "self-insured retention" because of injury to any "employee", or to the dependents or beneficiaries of any "employee," caused by an **"employee benefits incident"** to which this insurance applies.

Exhibit 16, at 922.

> An **"employee benefits incident"** means an act, error or omission in:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (4) Effecting enrollment, termination or cancellation of "employees" under **"employee benefits"**;
>
> \*　　\*　　\*　　\*　　\*　　\*

*Id.* at 926.

The definition of **"employee benefits"** includes pension plans. *Id.* (Section V—Definitions 2(c)). Liability of a fiduciary under ERISA is expressly excluded from coverage. *Id.* at 923.

The Schwegmann grocery voucher program was a pension plan which brings it squarely within the policy's definition of

"employee benefits." Pursuant to ERISA, the Schwegmann partnership, an insured under the policy, is liable to plaintiffs for the value of their vested benefits under section 1132(a)(1)(B), a non-fiduciary basis of liability.[28] The insured's liability arose out of its effecting termination of the pension plan which is defined under the policy as an employee benefit. Accordingly, this act easily falls within the policy's definition of an "employee benefits incident" thereby providing the partnership coverage for the liability it now faces.

USF&G argues that its policy does not cover any liability arising out of the sale of the grocery business and elimination of the grocery voucher program because its policy only covers *negligent* acts, not deliberate acts like the ones giving rise to this litigation. In its thorough trial memorandum, USF&G cites a host of authorities holding that incidents similar to those at issue in this case were not covered under similar employee benefits liability polices. *See* USF&G memorandum, at 51–53. It argues that those cases show that a negligent act is required in order to trigger coverage.

USF&G's point is well-taken but it is irrelevant in this case. The authorities cited involved cases where the policy language at issue expressly stated that only negligent acts were covered. The USF&G policy contains no such limitation and is therefore distinguishable from those cases in a manner which makes them wholly irrelevant to the issues pending here. Further, regardless of what other courts have held with respect to other insurance policies, the partnership's coverage under USF&G's policy is governed solely by the language and terms contained in the contract of insurance executed between USF&G and Schwegmann. In short, the Court finds little, if anything, persuasive or relevant about the cited authorities.

USF&G also argues that EEBL Declaration Item 3, although not part of the insuring agreement, evidences the parties' intention that the EEBL coverage for an employee benefits incident apply only to negligent acts. The declaration states that "this insurance does not apply to *negligent* acts, errors or omissions" occurring before January 1993. Exhibit 16, at 921. While it is true that contracts of insurance must be construed as a whole without undue deference to some sections and disregard of others, *see Benton Casing Service, Inc. v. Avemco Ins. Co.*, 379 So.2d 225 (La. 1979); *Harvey v. Mr. Lynn's, Inc.*, 416 So.2d 960 (La.App. 2d Cir.1982), the Court finds USF&G's argument on this point unconvincing given the clear language contained in the insuring agreement section. That language unambiguously states that coverage applies to any "act, error or omission." To insert the term "negligent" in this phrase would effect a significant reduction in coverage that would inure to USF&G's benefit. Given that this policy was prepared by USF&G, it must abide by the terms of the policy it drafted. Arguments as to what coverage it really intended to provide in contravention of the express terms of the insurance contract cannot operate to deprive the insured of the coverage to which it is clearly due under the policy. Accordingly, the Court

---

28. In its pretrial memorandum and at trial, USF&G attempted to argue that plaintiffs' complaint asserted only claims based on fiduciary breach. Regardless of the claims contained in prior pleadings, the joint pretrial order, to which USF&G was a party, clearly stated that plaintiffs were seeking a claim for benefits under ERISA. *See Branch–Hines v. Hebert*, 939 F.2d 1311, 1319 (5th Cir.1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial. . . .").

finds that USF&G's policy covered the Schwegmann partnership for the liability arising out its termination of the grocery voucher program.

### Self-insured Retention Limit

█ USF&G's policy is subject to a self-insured retention limit of $250,000 for "each claim." Exhibit 16, at 921. USF&G argues that this limit should apply to *each* plaintiff's claim for benefits as opposed to the single claim that the partnership has against USF&G for liability associated with termination of the grocery voucher program.

The USF&G policy does not define the term "claim." Notwithstanding plaintiffs' having availed themselves of the Louisiana direct action statute to sue USF&G directly, the true "claim" at issue here is the insured's (partnership's) claim against USF&G. Thus, even though Schwegmann's total liability from this incident arises out of many aggregated plaintiffs' claims, Schwegmann is ultimately asserting a single claim against USF&G based upon that liability. And while many individuals have sought recovery in this case, the total liability Schwegmann faces arose out of a *single act* that gave rise to that liability.

█ Based on the foregoing, an interpretation of the self-insured retention equally plausible to the one urged by USF&G is that Schwegmann's claim for indemnification under the policy is a single claim subject to the $250,000 self-insured retention limit. Given USF&G's failure to define "claim," the self-insured retention is ambiguous at best as applied to the facts of this case. Any ambiguity in the insurance policy must be resolved against the drafter and in favor of the insured. *Louisiana Ins. Guar. Ass'n (LIGA) v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763, 764 (La.1994); La. Civ.Code art.2056; *Lumar Marine, Inc. v. Ins. Co. of North America*, 910 F.2d 1267, 1273 (5th Cir.

1990). Moreover, a provision which seeks to narrow the insurer's obligation is also construed against the insurer. *Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 788 (5th Cir.1997) (citing *Reynolds v. Select Properties, Ltd.*, 634 So.2d 1180, 1183 (La.1994)). Accordingly, the Court concludes that the entire cross-claim asserted by Schwegmann against USF&G constitutes a single claim for purposes of the self-insured retention limit.

## V. Final Judgment and Remaining Issues

Rather than issue a final judgment at this time, the Court will hold a status conference in chambers on *Thursday, September 27, 2001, at 10:30 a.m.*, to discuss the parties' proposal(s) on relief for the "questionable" former employees and any other issues related to (1) calculation of damages for the class; (2) method(s) for distribution of damages to individual class members; and (3) form of the final judgment.

No later than *Thursday, September 20, 2001,* counsel are to submit to the Court memoranda and any exhibits, documentation, etc., relating to these remaining issues. Counsel are also **ORDERED** to submit no later than *Thursday, September 20, 2001*, a joint proposed form as to the final judgment. If counsel are unable to agree on a proposed form, each party shall submit its own suggested form for entry of a final judgment in this case.